[Cite as *Berry v. Lupica*, 2011-Ohio-3462.]

[Vacated opinion.   Please see 2011-Ohio-5381.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 95393**

---

## ROBERT BERRY

PLAINTIFF-APPELLANT

vs.

## JAMES LUPICA, ET AL.

DEFENDANTS-APPELLEES

---

**JUDGMENT:**
**AFFIRMED, AS MODIFIED**

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-613669

**BEFORE:**   Stewart, J., Blackmon, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:**   July 14, 2011

**ATTORNEYS FOR APPELLANT**

Christopher M. DeVito
Alexander J. Kipp
Morganstern, MacAdams & DeVito Co., LPA
623 West St. Clair Avenue
Cleveland, OH   44113-1204


**ATTORNEYS FOR APPELLEES**

Kris H. Treu
William H. Falin
Michael J. Kahlenberg
Moscarino & Treu, LLP
The Hanna Building, Suite 630
1422 Euclid Avenue
Cleveland, OH   44115

MELODY J. STEWART, J.:

{¶ 1}  Plaintiff-appellant, Robert Berry, brought suit against his supervisor, defendant-appellee, James Lupica, and their employer, defendant-appellee Wachovia Securities, alleging that Wachovia breached an agreement to pay the full amount of an arbitration award between Berry and his former employer, Merrill Lynch.  Wachovia counterclaimed, alleging that Berry had breached an agreement that he would compensate Wachovia for certain amounts that it advanced to Merrill Lynch in partial satisfaction of Berry's obligation under the arbitration award.  A jury ruled against Berry on all of his

claims and ruled in favor of Wachovia on its counterclaim. Berry unsuccessfully filed post-judgment motions seeking a remittitur, a new trial, and judgment notwithstanding the verdict. In this appeal, he offers overlapping arguments that he was neither legally, nor factually, obligated to repay the amounts that Wachovia advanced to Merrill Lynch and that the jury's award of damages beyond that specifically requested by Wachovia constituted grounds for a new trial.

I

{¶ 2} Berry worked for Merrill Lynch as a financial advisor before being hired by Wachovia (he was actually hired by First Union Corporation, which was taken over by Wachovia, which in turn was taken over by Wells Fargo, but the parties have agreed to use the name "Wachovia" in this litigation, so we use it too). The terms of Berry's employment agreement with Merrill Lynch contained a noncompetition agreement. When Berry started working for Wachovia, Merrill Lynch claimed that he did so in violation of the noncompetition agreement; Berry claimed that Merrill Lynch made defamatory statements about him regarding the violation of the noncompetition agreement. Berry and Merrill Lynch took their dispute to binding arbitration before the National Association of Securities Dealers ("NASD"). An NASD panel ruled in favor of Merrill Lynch on its claims against Berry and awarded it $250,000. The NASD panel also found for Berry on his defamation claim against Merrill Lynch and awarded him $125,000 in damages.

{¶ 3} Wachovia paid Merrill Lynch the $250,000 judgment against Berry. Two days later, Merrill Lynch issued a check to Berry for $125,000. Berry endorsed the Merrill Lynch check and gave it to his Wachovia branch manager with a note saying:

{¶ 4} "As we discussed attached is the award I received from Merrill Lynch. Please place this check on deposit with First Union Corporation to offset the interest due on our contract. The $125,000 is to be returned on demand. Thank you for your consideration and cooperation."

{¶ 5} The branch manager forwarded the check to the Wachovia legal department and the check was deposited into a Wachovia account dedicated to legal settlements. Berry later demanded to have the check returned to him, but Wachovia refused to return it.

{¶ 6} Berry brought this action raising a number of claims that collectively accused Wachovia of breaching the agreement to hold Berry's Merrill Lynch proceeds and produce them on demand. Wachovia counterclaimed, arguing that Berry breached a settlement agreement under which he would set-off the $250,000 Wachovia paid to Merrill Lynch by delivering to Wachovia the $125,000 he received from Merrill Lynch — Wachovia would pay the remaining $125,000 of the arbitration award as a courtesy to Berry. It claimed as damages the attorney fees it expended or would be required to expend in enforcing the settlement.

{¶ 7} At trial, the issue was whether the parties had an agreement that the proceeds from the $125,000 Merrill Lynch award to Berry should be applied as a set-off

for the $250,000 that Wachovia paid to Merrill Lynch. Berry claimed that at the time he was hired, Wachovia not only represented to him that it would pay for any legal fees associated with the Merrill Lynch arbitration, but that it would pay any damage award. Berry also offered testimony that the financial industry standard was for a current employer to make a transferring broker like Berry whole from any claims asserted by a former employer. Wachovia conceded that it agreed to pay for Berry's legal defense in the arbitration, but denied that it agreed, prior to the arbitration, to pay any damage award from the arbitration. It presented witnesses who testified that Wachovia and Berry agreed post-arbitration that Wachovia would pay the entire $250,000 Merrill Lynch judgment on the condition that Berry pay over to Wachovia his $125,000. Wachovia thus said it agreed to pay a net total of $125,000, an amount that it had been willing to pay to settle the arbitration. The jury found against Berry on all his claims. The jury found in favor of Wachovia on its counterclaim and awarded $432,000 in damages for the attorney fees Wachovia expended in enforcing the settlement agreement. Berry filed a motion for judgment notwithstanding the verdict and a new trial, arguing that the verdict was against the manifest weight of the evidence because the $432,000 damage award exceeded the $130,000 that Wachovia claimed as damages. The excessive award, Berry argued, showed that the jury's verdict had been the product of passion or prejudice. Berry also asked the court for remittitur. All post-judgment motions were denied.

II

{¶ 8} Berry argues that the court erred both by failing to direct a verdict and grant judgment notwithstanding the verdict on Wachovia's counterclaim because it was barred by the statutes of fraud and limitations.

A

{¶ 9} The court must issue a directed verdict when, "after construing the evidence most strongly in favor of the party against whom the motion is directed, [the court] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party ***." See Civ.R. 50(A)(4). This is the same legal standard applied to motions for judgment notwithstanding the verdict, *Ayers v. Woodard* (1957), 166 Ohio St. 138, 140 N.E.2d 401, and tests the legal sufficiency of the evidence. This is a question of law that does not require the reviewing court to weigh the evidence or test the credibility of witnesses. See *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 430 N.E.2d 935.

B

{¶ 10} The statute of frauds is set forth in R.C. 1335.05 and states: "No action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt, default, or miscarriage of another person; *** unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized."

{¶ 11} As Wachovia notes, its counterclaim was not brought in order to force Berry to pay a debt that he owed to another person — it brought the counterclaim seeking compensation for Berry's breach of the settlement agreement. "When the leading objection of the promisor is not to answer for another's debt but to subserve some pecuniary or business purpose of his own involving a benefit to himself, his promise is not within the statute of frauds ***."  See *Wilson Floors Co. v. Scioto Park, Ltd.* (1978), 54 Ohio St.2d 451, 377 N.E.2d 514, syllabus.  The statute of frauds is therefore inappliable and the court did not err as a matter of law by refusing to direct a verdict or grant judgment notwithstanding the verdict on that basis.

C

{¶ 12} Berry next argues that the court should have directed a verdict on statute of limitations grounds.  He maintains that the parties did not reduce their settlement agreement to writing, so the six-year statute of limitations for oral contracts began to run in April 2002, when he appealed from the arbitration award and otherwise sought to vacate the award.

{¶ 13} R.C. 2305.07 provides a six-year statute of limitations for contracts not reduced to writing.  The statute of limitations for oral contracts begins when "the cause" accrues.  Id.  When an oral agreement does not specify a time for repayment of a debt, the cause does not accrue until a party demands payment.  See *Aluminum Line Products Co. v. Brad Smith Roofing Co., Inc.* (1996), 109 Ohio App.3d 246, 258, 671 N.E.2d 1343; *Dandrew v. Silver*, 8th Dist. No. 86089, 2005-Ohio-6355, ¶14.

{¶ 14} It is unclear why Berry concludes that his breach occurred in April 2002 upon his appeal of the arbitration award. He gave Wachovia the $125,000 check he received from Merrill Lynch as part of his arbitration award. Even though Berry contests whether he intended the check to be used in settlement for Wachovia paying the $250,000 award against him, it was only when Berry filed this action in January 2007, seeking the return of the $125,000, that he could be said to have breached the settlement agreement. Wachovia filed its counterclaim in January 2009, just two years after Berry filed his complaint — well within the six-year statute of limitations. The court did not err by refusing to direct a verdict on statute of limitations grounds.

D

{¶ 15} Finally, Berry complains that the court should have granted judgment notwithstanding the verdict because the alleged settlement agreement between him and Wachovia was not truly a settlement agreement because the parties were not adversaries in the NASD arbitration.

{¶ 16} It is true that the parties were not adversaries in the NASD arbitration (Merrill Lynch and Berry were the adversaries), but that fact has no bearing on whether Berry and Wachovia reached an agreement on how they would handle the payment of Merrill Lynch's arbitration award. The right of parties to form contracts is general unless specifically prohibited by law or prevented by reason of fixed public policy. *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Kinney* (1916), 95 Ohio St. 64, 115 N.E. 505, paragraph one of the syllabus. To the extent that the parties differed on the

question of who would pay the Merrill Lynch award, their agreement was, in a broad sense, a "settlement" of that question. In any event, the nomenclature used to define the contractual parameters agreed to by the parties is far less important than the obligations imposed. Regardless of whether Wachovia correctly labeled the contract as a "settlement," the fact remains that the jury did, in fact, find that there was a valid contract between the parties.

III

{¶ 17} Berry next raises issues relating to the award of attorney fees as damages for the breach of the settlement. He maintains that under the American Rule of attorney fees, which states that the prevailing party in a legal action may not, in the absence of statutory authority, recover attorney fees, the court could not allow Wachovia to recover its legal fees as compensatory damages.

{¶ 18} As Berry notes, Ohio adheres to the rule that "a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation." *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, at ¶7. However, attorney fees are allowed as compensatory damages when the fees are incurred as a direct result of the breach of a settlement agreement. See *Raymond J. Schaefer, Inc. v. Pytlik*, 6th Dist. No. OT-09-026, 2010-Ohio-4714, ¶34; *Tejada-Hercules v. State Auto. Ins. Co.*, 10th Dist. No. 08AP-150, 2008-Ohio-5066, ¶10. The rationale behind the exception for allowing attorney fees expended as a result of enforcing a settlement agreement is that "any fees incurred after the breach of the settlement agreement were relevant to the

determination of compensatory damages, including those fees [a party was] 'forced' to incur by filing the action." *Tejada-Hercules*, at ¶10.

{¶ 19} The legal fees awarded in this case were the measure of compensatory damages directly related to Wachovia's need to enforce the settlement agreement. The court did not err by awarding Wachovia its attorney fees as compensatory damages.

IV

{¶ 20} Berry's primary argument, raised in various assignments of error, is that the jury's finding that a contract existed between him and Wachovia relating to the payment of Merrill Lynch is against the manifest weight of evidence.

{¶ 21} It is a basic principle of appellate review that judgments supported by competent, credible evidence going to all the material elements of a case must not be reversed as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus; *Gerijo, Inc. v. Fairfield,* 70 Ohio St.3d 223, 226, 1994-Ohio-432, 638 N.E.2d 533. We therefore indulge every reasonable presumption in favor of the trial court's judgment, *Season's Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273, and to the extent that the evidence is susceptible to more than one interpretation, we construe it consistently with the jury's verdict. *Ross v. Ross* (1980), 64 Ohio St.2d 203, 414 N.E.2d 426.

{¶ 22} Berry premised his complaint on two grounds: (1) that the Wachovia branch manager who recruited Berry told him that Wachovia "would take care of

everything" in the event Merrill Lynch brought suit, including the payment of legal fees and any damages award and (2) that Wachovia's promise was consistent with a financial industry practice under which firms that recruited brokers away from other firms would provide the recruited broker a legal defense in an arbitration and pay any damage award resulting from the arbitration.

{¶ 23} The evidence conflicted on whether Wachovia would indemnify Berry in the event he received an adverse arbitration ruling. Wachovia's branch manager recalled that at the time he recruited Berry, he offered to pay Berry's legal expenses, but had no recollection that he had agreed to pay for any damages. And the attorney who represented Wachovia in the arbitration said that when preparing the Berrys for their testimony in the arbitration, they told him that Wachovia "had not agreed to pay them for any awards." On the other hand, Berry's wife (who herself was recruited by Wachovia from Merrill Lynch and was a party to the arbitration), testified at the arbitration hearing that Wachovia had not used the word "indemnify" with her, but also said that even though she had no discussion with Wachovia about indemnification, she understood from industry practice that Wachovia would pay any arbitration awards.

{¶ 24} Berry points to testimony from both parties that firms in the financial services industry that recruited a broker from another firm would typically pay both legal fees and damages associated with any claims based on that recruitment. With that practice in mind, he takes Wachovia's silence on the issue of indemnity as a proof that it intended to adhere to the industry practice of reimbursing any damages awarded against

him. In other words, he argues that Wachovia could only vary from the industry practice by specifically telling him, at the recruitment stage, that it would not reimburse him in the event Merrill Lynch decided to enforce the terms of his employment contract.

{¶ 25} What is merely "typical" or "practice" in a heavily-regulated field like the financial services industry is not necessarily binding in the absence of a specific rule or regulation. To be binding, an industry custom must be so well known, uniform, long established, and generally acquiesced in as to induce a belief that the parties contracted with reference to it, nothing appearing in their contract to the contrary. See, e.g., *Fidelity Mtge. v. Bruno Airport Industry* (Dec. 10, 1981), 2d Dist. No. 1544, citing Restatement of the Law 2d, Contracts (1981), Section 221.

{¶ 26} Although Wachovia's in-house attorney acknowledged the "normal" practice whereby an investment firm would make a recruit whole for any arbitration award stemming from that recruitment, he testified that Wachovia would not make any promises to indemnify recruited brokers during the recruitment stage. Such a promise, said in-house counsel, could expose Wachovia to potential liability for interfering with business relations. The attorney who represented Wachovia at the arbitration agreed, noting that in preparation for the arbitration, he specifically asked the Berrys whether Wachovia agreed to indemnify them in order to prepare for a possible line of questioning from Merrill Lynch. He said he did so because a promise of indemnity by Wachovia could have raised the spectre of interference with a contract resulting from Wachovia's recruitment of the Berrys. So even though Wachovia might "normally" make a broker

whole for any arbitration award resulting from the recruitment process, it was not in any sense a "practice" from which the parties could be understood to have agreed to during the recruitment stage, and it was not clearly understood at the time of Berry's recruitment that Wachovia intended to reimburse him.

{¶ 27} Berry cites to evidence showing that two other employers recruited by Wachovia were promised that Wachovia would reimburse them for any arbitration award entered against them stemming from their recruitment. This evidence actually supports the jury's verdict because it shows that if Wachovia had the intention to reimburse Berry, it would have told him that from the outset. To the extent that Wachovia did reimburse some brokers that it recruited but not Berry, suggests that Wachovia did not adhere to any industry practice — not that it deliberately ignored the practice only in this case. Wachovia's in-house counsel testified that most cases involving the recruitment of brokers ended with a settlement prior to arbitration and that Wachovia would pay the settlement. But paying to settle an arbitration before the fact is not the same as paying an after-the-fact arbitration award where the broker is found personally liable for the award. So to the extent that Wachovia paid an arbitration claim for other employees does not establish a binding practice that could be applied to Berry's case.

{¶ 28} Other evidence supports the conclusion that Wachovia had no understanding that it would reimburse Berry for all of the Merrill Lynch arbitration award. At the close of the arbitration, the Wachovia branch manager spoke with the attorney who represented Wachovia at the arbitration, saying that Berry made a demand

for indemnification. He asked for instructions on what obligations, if any, Wachovia might have in relation to paying the award. That attorney emailed Wachovia's in-house counsel, stating his opinion that Wachovia had no obligation to indemnify Berry. The attorney recounted his recollection of settlement negotiations that occurred prior to the arbitration, noting that Wachovia had agreed in principle with Merrill Lynch to settle the matter on terms that would net Berry $130,000. There was credible evidence that Berry's attorney rejected the offer, instead demanding "millions." The attorney said that Berry's rejection of the settlement offer left Wachovia as a "hostage" to Berry's decision because Merrill Lynch would not settle with Wachovia alone. This meant that Wachovia would be forced to pay the costs of arbitration solely because Berry wished to "roll the dice" in the hope of being awarded more damages.

{¶ 29} The jury also heard evidence from which it could conclude that Berry agreed to turn over the $125,000 he received from Merrill Lynch in consideration of Wachovia's $250,000 payment to Merrill Lynch. A few weeks after the arbitration award, the branch manager sent in-house counsel an email stating that Berry was "very appreciative of our settlement to [sic] $125,000." A later email from the arbitration attorney recounted how he had spoken with Berry's arbitration attorney over the logistics of handling the various awards, stating that Berry's attorney had the "understanding that [Wachovia] has agreed to pay half the award against the brokers." When Berry turned over his Merrill Lynch check to Wachovia, the branch manager noted, "this is the $125,000 check for the Spencer/Berry settlement."

{¶ 30} Evidence concerning a "settlement" and representations from Berry's own attorney that Wachovia had agreed to pay "half the award" were credible evidence that the parties reached an agreement over how the Merrill Lynch arbitration award would be paid between them. This was consistent with Wachovia's act of placing the money in an account reserved for legal settlements. Berry's own actions enforce the conclusion that a settlement existed because he turned the $125,000 check over to Wachovia in 2002 and did not demand its return until 2005. Although Berry argued that he left the check in Wachovia's custody to cover potential interest, the jury could validly reject that argument because there was no evidence of any interest being due. Moreover, during the three years that Wachovia held the money, Berry never asked for any interest statements or otherwise inquired as to the debt that he claimed was accruing.

{¶ 31} The jury could find the totality of the evidence credibly established that Wachovia understood that it would pay the $250,000 Merrill Lynch award as a courtesy to Berry, but that Berry would remit the $125,000 he received from Merrill Lynch. The jury could also find that the parties did not have an agreement to adhere to any industry practice of reimbursement. It follows that the jury's verdict was not against the manifest weight of the evidence and that the court did not err by refusing to grant judgment notwithstanding the verdict or a new trial on the same grounds.

V

{¶ 32} The jury awarded Wachovia attorney fees totaling $432,000. Berry complains that Wachovia only presented evidence that it had expended $133,691 in

attorney fees. Berry argues that he is entitled to a new trial because the damage award showed that the jury's verdict was the product of passion and prejudice, a conclusion that he reinforces by noting that the jury had asked the court whether it could also award punitive damages against Berry.

{¶ 33} In its closing argument, Wachovia asked the jury to "return an award *** for $133,691 which is the amount of the fees and expenses we've incurred in defending the case." This amount was supported by billing statements and Berry does not question either the hourly rate charged by Wachovia's attorneys or the number of hours worked.

{¶ 34} During its deliberations, the jury asked the court: "are we able to award more to the defense above the requested legal fees?" and "can the defense get punitive damages?" When considering the questions, the court noted that there had been no claim for punitive damages. It also told the parties that "[Wachovia] certainly can't get more than the requested legal fees, so that's the answer to that." The jury awarded $432,000.

{¶ 35} In response to Berry's motion for judgment notwithstanding the verdict on the issue of attorney fees, Wachovia argued that the $133,691 it asked for at trial reflected only the fees and costs up to the second day of trial and that the jury knew that "additional fees and expenses would be incurred" based on testimony that there had been "time that hasn't been billed yet." It claimed that by the close of trial, its attorney fees were $163,758. Including post-trial motion practice, the total amount rose to $171,268.

{¶ 36} In a contract case, the general measure of damages is the amount necessary to place the nonbreaching party in the position it would have been in had the breaching

party fully performed under the contract. *Allied Erecting & Dismantling Co., Inc. v. Youngstown*, 151 Ohio App.3d 16, 31-32, 2002-Ohio-5179, 783 N.E.2d 523. Wachovia proved legal fees related to the enforcement of the settlement agreement in the amount of $133,691. Although it claimed that it incurred additional legal fees, it did not prove that assertion. "As a general rule, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty ***." *Rhodes v. Rhodes Indus., Inc*. (1991), 71 Ohio App.3d 797, 808-809, 595 N.E.2d 441. At a minimum, a party seeking legal fees must adhere to Prof.Cond.R. 1.5(a) and offer evidence showing the fee charged, the reasonableness of that fee, and the number of hours worked. Testimony by a Wachovia witness that there had "been time that hasn't been billed yet" is insufficient to establish any additional amount of legal fees because that testimony did not establish the hours expended or the necessity of that work. It follows that any award for legal fees beyond that specifically proven at trial was excessive and unsupported by the evidence.

{¶ 37} Berry argues that the jury's desire to impose more damages than had been proven, along with its request to impose punitive damages even though they were not requested, shows that it was prejudiced against him.

{¶ 38} Civ.R. 59(A)(4) states that the court may grant a new trial on grounds of "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice[.]" Because the assessment of damages is solely within the province of the jury, *Jeanne v. Hawkes Hosp. of Mt. Carmel* (1991), 74 Ohio App.3d 246, 258, 598

N.E.2d 1174, the courts do not look to the size of the award alone as proving the existence of passion or prejudice. *Pearson v. Cleveland Acceptance Corp.* (1969), 17 Ohio App.2d 239, 245, 246 N.E.2d 602. Instead, it is said that the award must be so grossly disproportionate as to shock the sensibilities. *Airborne Express, Inc. v. Sys. Research Laboratories, Inc.* (1995), 106 Ohio App.3d 498, 510, 666 N.E.2d 584; *Toledo, C. & O. RR. Co. v. Miller* (1923), 108 Ohio St. 388, 140 N.E.2d 617.

{¶ 39} Although the damages awarded were excessive in relation to that requested and proven at trial, we are unable to conclude that they were so grossly disproportionate as to shock sensibilities and require a new trial. It may be an understatement to say that the jury did not take a liking to Berry's position in this case — its desire to award punitive damages was proof enough of its enmity toward him. But it is important in a case like this to differentiate damages from liability. As we have recounted, there was more than enough competent, credible evidence to support the jury's finding that Berry breached his settlement agreement with Wachovia. We are confident that any prejudice shown by the jury's damages award did not influence its finding that Berry breached the agreement. The court did not err by refusing to order a new trial on liability grounds.

{¶ 40} We therefore sustain this assignment of error in part on grounds that Wachovia failed to offer evidence sufficient to justify the amount of damages awarded by the jury. The damage award is modified to $133,691 — the amount of damages that Wachovia requested and proved at trial.

Judgment affirmed, as modified.

It is ordered that appellant and appellees share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MELODY J. STEWART, JUDGE

PATRICIA ANN BLACKMON, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR